UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                    :

DEUTSCHE BANK AG,                    :

                                     :

        Plaintiff-counterclaim-defendant,    :                  04 Civ. 7192 (SHS)

                                     :

        -against-                      :                <u>OPINION & ORDER</u>

                                   :

JPMORGAN CHASE BANK (f/k/a THE CHASE  :
MANHATTAN BANK),                    :

                                   :

        Defendant-counterclaim-plaintiff.    :

                                   :

                                   :
-------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

## Table of Contents

I.   Introduction ................................................................................................. 2
II.   Background .................................................................................................. 4
III.  Discussion ................................................................................................ 15
  A.   Summary Judgment Standard ............................................................... 15
  B.   Deutsche Bank Failed to Meet Its Obligations Pursuant to the Amended Credit
Agreement By Refusing to Fund the July Advance.............................................. 16
    1.   *Verizon Had Not Yet Triggered an "Event of Default" by Canceling Its Option to
Reacquire Genuity, and Genuity's Request for Funds Did Not Create a "Default" by
Bringing About Verizon's Decision.* ................................................................ 18
      a.   No "Event of Default" Related to the Verizon Option ............................. 18
      b.   No "Default" Related to the Verizon Option ......................................... 22
    2.   *Deutsche Bank's Dissatisfaction with Genuity's Requests for Information Did Not
Constitute an "Event of Default."* ................................................................ 24
    3.   *The Record Does Not Support Deutsche Bank's Contention that Genuity Made
Incorrect Representations in Connection with the July Advance, and Therefore Deutsche
Bank Has Not Shown an "Event of Default."* .................................................. 26
      a.   Statements that Genuity Did Not Expect to Draw on the Credit Facility Until the Fall
of 2002 ................................................................................................... 27
      b.   Statements that Genuity Committed Itself to Draw on Its Verizon Credit Facility
*Pari Passu* with Its Credit Facility with the Banks ............................................. 27
      c.   Allegedly False Statements Regarding Genuity's Reasons for Requesting the July
Advance .................................................................................................. 29

     *4.    Res Judicata Does Not Prevent This Court from Adjudicating the Issue of Whether Deutsche Bank Breached the Amended Credit Agreement.*.................................................. 30

C.   JPMorgan Chase's Proposed Distribution Is "Ratable" Pursuant to the Amended Credit Agreement, and that Distribution Is Not Affected by This Court's Determination as to the Validity of Amendment No. 1. ................................................................................................... 35

     *1.    JPMorgan Chase's Proposed Distribution Is "Ratable" Pursuant to the Amended Credit Agreement.* .................................................................................................... 35

     *2.    Amendment No. 1 Is Not Valid Because It Was Not Properly Ratified.* ....................... 41

IV.   Conclusion ....................................................................................................................... 44

## I.    Introduction

This contract dispute arises out of a $2 billion amended credit agreement between Genuity, Inc. – a now-bankrupt internet company – and nine major international banks, including plaintiff Deutsche Bank AG and defendant JPMorgan Chase Bank ("JPMorgan Chase"), which serves as the Administrative Agent between the banks and Genuity.  The amended credit agreement created a credit facility from which Genuity could draw funds with very little notice in return for certain annual fees to each of the banks.  On July 22, 2002, Genuity notified the banks that it sought to draw the entire amount – $850 million ("the July Advance") – then available to it under the credit facility.  Prior to this request, the banks believed they had an understanding that Genuity would draw simultaneously and in equal amounts on another credit facility that Genuity had arranged with Verizon Communications, Inc. – the company from which Genuity had previously been spun off.  However, Genuity did not also draw from its credit facility with Verizon on July 22, 2002.  Although the banks were surprised by the timing and circumstances surrounding Genuity's request, eight of the nine banks nevertheless recognized that they were obligated pursuant to the amended credit agreement to advance their portion of the funds.  Deutsche Bank, however, refused to advance the $127.5 million in funds that constituted its portion of the banks' obligations pursuant to the amended credit agreement.

On July 24, 2002 – two days after Genuity requested the July Advance – the Verizon Board of Directors voted to cancel its option to reacquire a controlling interest in Genuity. Verizon's decision constituted an "Event of Default" pursuant to the amended credit agreement with the nine banks.  On the same day, Genuity filed a lawsuit against Deutsche Bank in the U.S. District Court for the District of Massachusetts, alleging breach of contract stemming from Deutsche Bank's failure to forward its share of the funds from the July Advance.  That lawsuit was eventually settled.

On November 12, 2002, Genuity and seven of the nine banks executed a written amendment to the amended credit agreement ("Amendment No. 1"), which provided that a bank that defaulted on its obligation to fund the July Advance would not be repaid any other advances until after the lenders that had funded the July Advance had achieved parity with the defaulting lender.  Deutsche Bank refused to sign Amendment No. 1, and maintained that the amendment was invalid without its signature.

Approximately two weeks later – on November 27, 2002 – Genuity filed a voluntary petition for bankruptcy pursuant to Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq.  However, in subsequently confirming the plan of liquidation of Genuity's assets, the bankruptcy court declined to resolve the dispute among the lending banks arising out of Deutsche Bank's failure to fund the July Advance.  Instead, the bankruptcy court approved distribution to JPMorgan Chase, as Administrative Agent, of the entire amount available to the bank group, and directed that the amount in dispute between the banks in this action – an estimated $47.6 million – be maintained by JPMorgan Chase in escrow.

In September 2004, Deutsche Bank commenced this litigation, seeking a declaratory judgment that Amendment No. 1 to the amended credit agreement be determined to be null and

void, and that the escrowed funds be distributed to it.  In its answer and counterclaims, JPMorgan Chase alleges that Deutsche Bank breached the amended credit agreement by refusing to fund the July Advance, and therefore JPMorgan Chase seeks a declaration that it can distribute the $47.6 million held in escrow to the eight banks that funded the July Advance.

Following extensive discovery proceedings, both parties now move for summary judgment.  As set forth below, this Court finds that:  Deutsche Bank breached the amended credit agreement by not forwarding the July Advance; Amendment No. 1 to the amended credit agreement is null and void, but nevertheless JPMorgan Chase may – pursuant to the powers granted to the Administrative Agent in the amended credit agreement – distribute the escrowed funds in such a manner that repays the eight banks that made the July Advance for the July Advance before distributing funds due on certain other advances in order to give the funding banks the same percentage recovery as that achieved by Deutsche Bank.  Accordingly, for the reasons elucidated below, JPMorgan Chase's motion for summary judgment is granted and Deutsche Bank's motion for summary judgment is denied.

## II.    Background

The following facts are either undisputed or, where disputes exist, they are set forth and do not create a genuine issue of material fact.

Genuity, Inc. is an internet company that had been "spun off" in June 2000 by Verizon Communications, Inc. as a requirement for Federal Communications Commission approval of the merger between GTE and Bell Atlantic that led to Verizon's formation.  (Declaration of Steven G. Kobre in Support of Plaintiff Deutsche Bank AG's Motion for Summary Judgment dated August 10, 2006 ("Kobre Decl."), Ex. 3, Mar. 30, 2001 Genuity 10-K, at 3.)  However, after the spin off, Verizon maintained an option for five years to reacquire a controlling interest

4

in Genuity ("the Verizon Option").  (Affidavit of Frank H. Wohl in Support of Defendant-Counterclaim-Plaintiff JPMorgan Chase Bank's Motion for Summary Judgment dated June 9, 2006 ("Wohl Aff."), Ex. 1, Amended Credit Agreement § 1.01 (defining "Verizon Option").)  In connection with Verizon's option to reacquire a controlling interest in Genuity, the two companies also negotiated a credit agreement by which Verizon created a $2 billion credit facility ("the Verizon credit facility") for the benefit of Genuity.  (Kobre Decl., Ex. 5, Verizon Credit Agreement.)  However, the Verizon credit facility specified that funds would cease to be available to Genuity if Verizon ever opted not to reacquire (or "reintegrate") the company.  (Id., Verizon Credit Agreement at VZ3 009084.)

On September 5, 2000, Genuity and ten banks – The Chase Manhattan Bank, Credit Suisse First Boston, Citicorp USA, Inc., BNP Paribas, Morgan Guaranty Trust Co. of New York, The Bank of New York, The Industrial Bank of Japan, Toronto Dominion (Texas) Inc., Wachovia Bank, N.A., and Deutsche Bank AG – entered an agreement ("the Original Credit Agreement") to establish a $2 billion unsecured credit facility in favor of Genuity.  (Wohl Aff., Ex. 1, Five-Year Credit Agreement dated September 5, 2000.)  Pursuant to the Original Credit Agreement, the loan commitments of each of the ten banks were as follows:

- The Chase Manhattan Bank committed $300,000,000, which represented 15% of the total.

- Citicorp USA, Inc. committed $300,000,000, which represented 15% of the total.

- Credit Suisse First Boston committed $300,000,000, which represented 15% of the total.

- Deutsche Bank AG committed $300,000,000, which represented 15% of the total.

- BNP Paribas committed $200,000,000, which represented 10% of the total.

- Morgan Guaranty Trust Co. of New York committed $200,000,000, which represented 10% of the total.

- The Bank of New York committed $100,000,000, which represented 5% of the total.

- The Industrial Bank of Japan committed $100,000,000, which represented 5% of the total.

- Toronto Dominion (Texas) Inc. committed $100,000,000, which represented 5% of the total.

- Wachovia Bank, N.A. committed $100,000,000, which represented 5% of the total.

(Id.; Affidavit of Mary Ellen Egbert dated June 9, 2006 ("Egbert Aff.") ¶ 4.)  The banks

appointed The Chase Manhattan Bank – a predecessor in interest to JPMorgan Chase – to act as

their Administrative Agent ("Agent") pursuant to the Original Credit Agreement.  (Wohl Aff.,

Ex. 1, Original Credit Agreement §§ 7.01-7.03.)  In exchange for the committed revolving credit

facility, Genuity paid the banks an annual commitment fee of approximately $2.5 million.

(Wohl Aff., Ex. 1, § 2.04; Egbert Aff. ¶ 7.)  Under the Original Credit Agreement, Genuity had

the right to draw on the facility at any time by issuing to the Agent a "Notice of Revolving Credit

Borrowing" (or "Notice") by telephone, confirmed immediately in writing, in the form annexed

to the Original Credit Agreement.  (Wohl Aff., Ex. 1, § 2.02.)  The Notice was to specify the date

and amount of the draw, confirm the continued correctness of Genuity's representations and

warranties, and certify that no "Event of Default" had occurred, was continuing, or would result

from the borrowing.  (Id. § 3.02.)  The Original Credit Agreement required that Genuity give this

Notice no later than 11:00 a.m. "New York City time," and it allowed Genuity the option of

demanding the advance of funds by 12:00 noon on the third business day after the Notice and

pay one particular interest rate, or to demand the funds by 12:00 noon on the same business day and pay a higher interest rate.  (Id.)

As noted above, the Original Credit Agreement also set forth certain "Events of Default," which would terminate the obligation of the banks to make advances to Genuity.  (Id. § 6.01.) One such "Event of Default" would result if "any representation or warranty made or deemed made by [Genuity] . . . shall prove to have been incorrect in any material respect when made or deemed made."  (Id. § 6.01(b).)  Another such default would occur if Verizon cancelled its option to reacquire control of Genuity.  (Id. § 6.01(g).)  As discussed below, the parties in this action dispute whether such an "Event of Default" had occurred as of the time that Genuity served Notice of the July Advance, or whether the "Event of Default" instead occurred several days after that Notice.  (Compare JPMorgan Chase Bank's Local Civil Rule 56.1 Statement in Support of its Motion for Summary Judgment ("Def.'s 56.1") ¶ 8 with Deutsche Bank's Counter Statement of Material Fact ("Pl.'s 56.1 Counter Statement") ¶ 8.)

Approximately one year after executing the Original Credit Agreement – on September 24, 2001 – Genuity and nine banks – JPMorgan Chase, Credit Suisse First Boston, Citibank, N.A., BNP Paribas, The Bank of New York, The Industrial Bank of Japan, Toronto Dominion (Texas) Inc., Wachovia Bank, N.A., and Deutsche Bank AG – entered into an Amended and Restated Credit Agreement (the "Amended Credit Agreement").  (Deutsche Bank AG's Local Civil Rule 56.1 Statement in Support of its Motion for Summary Judgment ("Pl.'s 56.1") ¶ 1; JPMorgan Chase Bank's Counter Statement of Material Fact ("Def.'s 56.1 Counter Statement") ¶ 1.)  The lending banks retained the same percentage commitments as under the Original Credit Agreement; however, because the Chase Manhattan Bank and Morgan Guaranty Trust Co. of New York had merged in June 2000, the combined entity – JPMorgan Chase – now became the

7

Agent and the holder of a $500,000,000 commitment to Genuity, representing 25% of the total credit facility.  (See Wohl Aff., Ex. 2, Amended Credit Agreement.)

This Amended Credit Agreement still provided for $2 billion of financing to Genuity, but whereas the Original Credit Agreement provided only for "Revolving Credit Advances" (also known as "Revolver Advances"), the new agreement provided for both "Revolving Credit Advances" and "Letter of Credit" advances.  (Compare Wohl Aff., Ex. 1, Credit Agreement § 2.01 and Wohl Aff., Ex. 2, Amended Credit Agreement § 2.01.)  The new "Letter of Credit" option allowed Genuity to use the credit facility to obtain funds without actually drawing down on the facility.  (Wohl Aff., Ex. 2, Amended Credit Agreement §§ 2.01(b), 2.04; Wohl Aff., Ex. 6, Nason 3/16/06 Dep. at 28:5-28:11, 31:24-32:8.)

On September 27, 2001 – three days after the parties ratified the Amended Credit Agreement – JPMorgan Chase issued a Letter of Credit pursuant to the Amended Credit Agreement to Genuity in the amount of $1.15 billion in order to support a bond offering by Genuity in that amount.  (Kobre Decl., Ex. 20, Sept. 27, 2001 Letter of Credit; Declaration of Jeffrey Welch dated Jul. 27, 2006 ("Welch Decl.") ¶ 3.)  In the event of default on the Genuity bonds, the bondholders could draw on the Letter of Credit, and the other bank lenders were obligated to reimburse JPMorgan Chase in proportion to their commitments under the Amended Credit Agreement.  (Wohl Aff., Ex. 2, Amended Credit Agreement § 2.04(c); Wohl Aff., Ex. 7, Coleman 3/13/06 Dep. at 121:18-23; Kobre Decl., Ex. 74, Sept. 17, 2002 Shearman & Sterling Memorandum, at JPM 018573-74.)  With the issuance of the $1.15 billion Letter of Credit on September 27, 2001, Genuity still had access to $850 million of the $2 billion originally available pursuant to the Amended Credit Agreement.

On July 22, 2002, Genuity issued a Notice of Borrowing to JPMorgan Chase in accordance with the Amended Credit Agreement.  (Def.'s 56.1 ¶ 2; Pl.'s 56.1 Counter Statement ¶ 2.)  This Notice requested to borrow all $850 million remaining available to Genuity in the form of a Revolving Credit Advance.  (Wohl Aff., Ex. 14, Notice of Borrowing dated July 22, 2002.)  Genuity called for the funds to be provided to it by 12:00 noon, Eastern Standard Time, of that same day, as it was entitled to do pursuant to the Amended Credit Agreement.  (Id.)

JPMorgan Chase contends that Genuity's Notice of Borrowing conformed to the requirements of the Amended Credit Agreement.  (Def.'s 56.1 ¶ 3.)  However, Deutsche Bank disputes whether Genuity satisfied all conditions necessary to receive a Revolving Credit Advance under the Amended Credit Agreement.  (Pl.'s 56.1 Counter Statement ¶ 3.)  With respect to this dispute, JPMorgan Chase contends that Genuity's representations and warranties under the Amended Credit Agreement were correct (Def.'s 56.1 ¶ 4), whereas Deutsche Bank contends that "Genuity made multiple representations in connection with the Credit Agreement that were incorrect."  (Pl.'s 56.1 Counter Statement ¶ 4.)  Thus, whereas JPMorgan Chase contends that as of July 22, 2002, "no Event of Default under the Amended Credit Agreement had occurred, was continuing or would result from the borrowing," (Def.'s 56.1 ¶ 5), Deutsche Bank contends that on July 22, 2002, "both an Event of Default and a Default under the Credit Agreement had occurred, was continuing or would result from the borrowing."  (Pl.'s 56.1 Counter Statement ¶ 5.)  Specifically, Deutsche Bank contends that "Genuity's false representations on July 22, 2002 represented an Event of Default and a Default."  (Id.)

On July 22 and 23, 2002, all of the lenders except Deutsche Bank advanced a total of $722.5 million to Genuity, (Def.'s 56.1 ¶ 6; Pl.'s 56.1 Counter Statement ¶ 6), and this advance constituted a Revolving Credit Advance (the "July Advance"), (Pl.'s 56.1 ¶ 5; Def.'s 56.1

Counter Statement ¶ 5).  The eight funding banks concluded that there was no evidence that Genuity's representations and warranties were incorrect or that any other "Event of Default" had occurred, was continuing, or would result from the borrowing, and that consequently they were all obligated to fund the July Advance.  (Declaration of Randall Carey Bingham dated June 8, 2006, ¶ 3; Affidavit of John Doyle dated June 8, 2006, ¶ 3; Egbert Aff. ¶ 8; Affidavit of Charles Mark Hedrick dated June 7, 2006, ¶ 3; Affidavit of George Malanga dated June 8, 2006, ¶ 3; Declaration of Peter Reynolds dated June 9, 2006, ¶ 3; Declaration of Charles Romano dated June 8, 2006, ¶ 3; Affidavit of Didier Siffer dated June 7, 2006, ¶ 3.)  However, Deutsche Bank took the position that it would not fund its share of the July Advance until Genuity provided written answers to certain requests for information that it had posed to Genuity.  (Wohl Aff., Ex. 27, e-mail from Stephen Wade to Stuart Lewis dated July 23, 2002, DB213633; Ex. 28, e-mail from Hugo Banzinger dated July 25, 2002, DB2302393-94.)  Deutsche Bank also sought a commitment that <u>Verizon</u> would advance funds to Genuity in connection with the July Advance from the banks, even though Genuity had not drawn on its <u>Verizon</u> credit facility.  (Wohl Aff., Ex. 29, e-mail from Andreas Neumeier to Constance Coleman dated July 23, 2002, DB001080.) Indeed, Deutsche Bank's Chief Credit Officer wrote an e-mail explaining that he had discussed with Deutsche Bank's Chief Investment Banking Officer the "decision not to fund until we have better information and Verizon's commitment to meet their share," and reporting that the latter officer "agrees with it even if we get indicted."  (Wohl Aff., Ex. 28, e-mail from Hugo Banzinger dated July 25, 2002, DB230293-94.)  As discussed below, Deutsche Bank and JPMorgan Chase now dispute whether Deutsche Bank's failure to participate in the July Advance constitutes a breach of the Amended Credit Agreement.

On July 24, 2002, the Verizon Board of Directors met by telephonic conference call and voted to cancel its option to reacquire Genuity.  (Wohl Aff., Exs. 11, 15, 54.)  JPMorgan Chase contends that "[o]n July 24, 2002 at approximately 4:30 p.m., an Event of Default under the Amended Credit Agreement occurred, when Verizon cancelled its option to reacquire Genuity." (Def.'s 56.1 ¶ 8.)  However, Deutsche Bank disputes this fact and instead contends that although Verizon "formally extinguished" its option to reacquire Genuity "on July 24, 2002 at 4:30 p.m., Verizon cancelled its option to reintegrate Genuity prior to that time."  (Pl.'s 56.1 Counter Statement ¶ 8.)

On the same day, Genuity filed a lawsuit against Deutsche Bank in the U.S. District Court for the District of Massachusetts alleging breach of contract "as a result of its wrongful failure to fund its share of a credit obligation extended by a group of participating financial institutions to Genuity."  (Kobre Decl., Ex. 63, Complaint in Genuity Inc. v. Deutsche Bank AG, No. 02 CV 11502 (D. Mass.) dated July 24, 2002.)  Genuity sought damages for Deutsche Bank's alleged breach of contract.  (Id.)  That lawsuit was eventually settled in connection with the Genuity bankruptcy proceedings.  (See Kobre Decl., Ex. 76, Order in In re Genuity Inc., et al., No. 02-43558 (Bankr. S.D.N.Y. Jan. 23, 2003).)

On July 29, 2002, Genuity negotiated a forbearance and standstill agreement with all of the lending banks except Deutsche Bank.  (Wohl Aff., Ex. 35.)  Pursuant to this agreement and six similar agreements executed between July 29 and November 22, 2002 (collectively, the "Standstill Agreements"), Genuity paid the funding banks a total of $208.3 million as partial repayment of the $722.5 million that Genuity received in the July Advance.  (Wohl Aff., Ex. 35-40.)  Because Deutsche Bank had not participated in the July Advance – which constituted the only Revolving Credit Advance on the $2 billion credit facility – it did not share in the

distribution of these funds.  (Wohl Aff., Ex. 67, Affidavit of Patrick O'Brien dated Apr. 24, 2006, ¶ 34.)  Nevertheless, Deutsche Bank objected to its exclusion from what it called the "non-pro-rata" payments to the funding banks.  (Wohl Aff., Ex. 42, letter from Mark Cohen to Mary Ellen Egbert dated Sept. 20, 2002.)

On November 12, 2002, JPMorgan Chase and six of the other lending banks attempted to amend the Amended Credit Agreement by signing "Amendment No. 1."  (Pl.'s 56.1 ¶ 8; see also Wohl Aff., Ex. 43, Amendment No. 1 to the Amended and Restated Credit Agreement dated as of Nov. 12, 2002.)  Neither Deutsche Bank nor BNP Paribas signed Amendment No. 1.  (Pl.'s 56.1 ¶ 14; Wohl Aff., Ex. 43.)  However, JPMorgan Chase contends that BNP Paribas has ratified Amendment No. 1 through its conduct, "including signing the common interest agreement" (Def.'s 56.1 Counter Statement ¶ 14), and that the attempted amendment was successful because it was signed by all of the "Required Lenders," as defined by the Amended Credit Agreement (id. ¶ 8).

Deutsche Bank contends that Amendment No. 1 purports to modify Section 2.14 of the Amended Credit Agreement by allowing JPMorgan Chase to distribute payments first to the lenders that funded the July Advance until the July Advance was repaid in full before distributing any payments to any lender that contributed only to advances made under the Letter of Credit rather than under the July Revolving Credit Advance.  (Pl.'s 56.1 ¶ 9.)  The only bank that fit those parameters was Deutsche Bank.  (Id.)  Deutsche Bank also contends that Amendment No. 1 purports to waive the application of Section 2.16 of the Amended Credit Agreement by forgiving the obligation of each lender to share excess payments ratably with other lenders.  (Id. ¶ 10.)  By enacting these changes, Deutsche Bank contends that Amendment No. 1 would modify the obligations that the banks owe to one another to share excess payments

"ratably."  (Id. ¶¶ 11-13.)  However, JPMorgan Chase contends that "Amendment No. 1 does not modify the obligation [it] owed to distribute payments ratably to Deutsche Bank . . . [because] [i]n order to distribute 'ratably,' JPMorgan is required to consider the undisputed fact that Deutsche Bank retained 100% on the Revolver Advance that Deutsche Bank did not fund." (Def. 56.1 Counter Statement ¶ 11.)

On November 27, 2002 – approximately two weeks after seven of the banks signed Amendment No. 1 – Genuity filed a voluntary petition for bankruptcy pursuant to Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq., in the United States Bankruptcy Court for the Southern District of New York.  Genuity's bankruptcy petition caused a default on the Genuity bonds that had been backed by the Letter of Credit previously issued in September of 2001 under the Amended Credit Agreement.  (Kobre Decl., Ex. 20.)  That default triggered a draw on JPMorgan Chase's $1.15 billion Letter of Credit, with the result that the lending banks became obligated to make Letter of Credit Advances to JPMorgan Chase totaling $1.15 billion for payment to the bondholders.  (Kobre Decl., Ex. 74, Sept. 17, 2002 Shearman & Sterling Memorandum.)  This time, all nine banks – including Deutsche Bank – funded the Letter of Credit Advance pursuant to the Amended Credit Agreement.  (Pl.'s 56.1 ¶ 6; Def.'s 56.1 Counter Statement ¶ 6.)  Deutsche Bank advanced $172.5 million – which was its 15% share of the $1.15 billion Letter of Credit advance.  (Pl.'s 56.1 ¶ 7; Def.'s 56.1 Counter Statement ¶ 7.)

Two months later, on January 23, 2003, the bankruptcy court signed an Order approving a settlement agreement between Deutsche Bank and Genuity by which Genuity agreed to a dismissal with prejudice of its breach of contract lawsuit against Deutsche Bank in the U.S. District Court for the District of Massachusetts in exchange for Deutsche Bank withdrawing its objections to Genuity selling its assets.  (See Kobre Decl., Ex. 76, Order in In re Genuity Inc., et

13

al., No. 02-43558 (Bankr. S.D.N.Y. Jan. 23, 2003) ¶ 2; see also Wohl Aff., Ex. 67, Affidavit of

Patrick O'Brien, at Ex. 13, "Settlement Agreement.")  The bankruptcy court did not resolve the

dispute among the lending banks arising out of Deutsche Bank's failure to fund its share of the

July Advance.  (Kobre Decl., Ex. 76, ¶ 3.)  Indeed, the bankruptcy court judge stated that that

was not an issue to be resolved under the bankruptcy plan.  (Wohl Reply Aff., Ex. 34, Transcript

of 11/17/03 proceedings before the United States Bankruptcy Court for the Southern District of

New York at 109:22-110:24.)  Instead, the bankruptcy court dealt with the dispute by approving

distribution to JPMorgan Chase, as Agent, of the entire amount available to the bank group,

leaving resolution of the inter-bank dispute to another court.  (Id.)  The bankruptcy court directed

that the amount in dispute, an estimated $47.6 million, be maintained by JPMorgan Chase, as

Agent, in escrow.  (Id.)

On appeal, Judge John G. Koeltl of the U.S. District Court for the Southern District of

New York affirmed the bankruptcy court's rulings.  Judge Koeltl explicitly recognized that the

dispute between Deutsche Bank and the other lending banks remained unresolved:  "Instead of

deciding how the money should be divided, the Bankruptcy Court approved the Plan's method of

making the entire Class 3 distribution to Chase as agent, thus allowing the Lenders to resolve the

dispute over the funds among themselves in the appropriate forum."  (Wohl Aff., Ex. 47, Order

in Deutsche Bank AG v. GLT Liquidating Trust and JPMorgan Chase Bank, No. 04 Civ. 00591,

*5-6 (S.D.N.Y. Aug. 4, 2004).)  In addition, Judge Koeltl observed that "[a]llowing a distribution

to be made directly to Deutsche Bank on its claim would have, in effect, recognized Deutsche

Bank's asserted right to a pro rata share of the . . . distribution [to the lending banks] despite its

failure to fund the July 2002 advance."  (Id. at *5.)

In September 2004, Deutsche Bank commenced the present action before this Court, seeking a declaratory judgment that Amendment No. 1 to the Amended Credit Agreement be deemed null and void, and therefore that the escrowed funds be distributed to Deutsche Bank.  In its answer and counterclaims, JPMorgan Chase alleges that Deutsche Bank breached the Amended Credit Agreement by refusing to fund the July Advance, and seeks a declaration that it can distribute the $47.6 million held in escrow to the eight funding banks pursuant to its proposed distribution, which would give Deutsche Bank a total recovery on the credit facility in proportion to its original commitment and in proportion to its performance on its funding obligations.

As noted above, following discovery proceedings, both parties now move for summary judgment.

**III.    Discussion**

A.    <u>Summary Judgment Standard</u>

Summary judgment is appropriate only if the evidence shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); <u>Allen v. Coughlin</u>, 64 F.3d 77, 79 (2d Cir. 1995); <u>LaFond v. Gen. Physics Servs. Corp.</u>, 50 F.3d 165, 171 (2d Cir. 1995).  In determining whether a genuine issue of material fact exists, the Court "is to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  <u>Patterson v. County of Oneida</u>, 375 F.3d 206, 219 (2d Cir. 2004); <u>see also</u> <u>LaFond</u>, 50 F.3d at 171.  However, the party opposing summary judgment "may not rely on mere conclusory allegations or speculation, but instead must offer some hard evidence" in support of its factual assertions, <u>D'Amico v. City of New</u>

15

York, 132 F.3d 145, 149 (2d Cir. 1998), such that "'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'"  Golden Pacific Bancorp v. F.D.I.C., 375 F.3d 196, 200 (2d Cir. 2004) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

Where, as here, both parties have moved for summary judgment, the same legal standards apply.  See Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001).  "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  Id. (citing Schwabenbauer v. Bd. of Educ., 667 F.2d 305, 314 (2d Cir. 1981)); Stoyanovich v. Fine Art Capital LLC, No. 06 Civ. 13158, 2007 U.S. Dist. LEXIS 61041, at *6 (S.D.N.Y. Aug. 17, 2007).

> B.     Deutsche Bank Failed to Meet Its Obligations Pursuant to the Amended Credit Agreement By Refusing to Fund the July Advance.

Deutsche Bank breached the Amended Credit Agreement by refusing to fund the July Advance.  Specifically, Deutsche Bank breached Section 2.01, which requires lenders "on the terms and conditions hereinafter set forth, to make Revolving Credit Advances to the Borrower," and Section 2.02, which provides that each Lender "shall [fund] such Lender's ratable portion of such Revolving Credit Borrowing."  (Wohl Aff., Ex. 2, Amended Credit Agreement §§ 2.01, 2.02.)  Deutsche Bank's conduct constitutes a material breach because it "go[es] to the root of the agreement between the parties."  Frank Felix Assocs. v. Austin Drugs, 111 F.3d 284 (2d Cir. 1997), corrected opinion reported at 1997 U.S. App. LEXIS 19795, at *14 (2d Cir. Apr. 10, 1997).

Deutsche Bank attempts to avoid a determination that it breached the Amended Credit Agreement by contending that as of the time that Genuity served the banks with the Notice of the

July Advance, three distinct "Events of Default" or "Default[s]" had occurred pursuant to the Amended Credit Agreement, and therefore it was not obligated to fund the July Advance.

Section 6.01 of the Amended Credit Agreement provides that:

> "[i]f any . . . [Event of Default] shall occur and be continuing . . . then . . . the Agent . . . shall at the request, or may with the consent of the Required Lenders, by notice to the Borrower, declare the obligation of each Lender Party to make Advances (other than Letter of Credit Advances by the Issuing Bank or a Lender pursuant to Section 2.04(c)) and of the Issuing Bank to issue Letters of Credit to be terminated, whereupon the same shall forthwith terminate . . . ."

(Wohl Aff., Ex. 2, Amended Credit Agreement § 6.01.)  Based on this provision, Deutsche Bank contends an "Event of Default" had occurred on the grounds that:  1) Verizon had already "effectively" canceled its option to reacquire Genuity as of the time of the July Advance; 2) Genuity provided insufficient responses to Deutsche Bank's various requests for information in connection with the July Advance; and 3) Genuity made representations or warranties in connection with the July Advance that were materially incorrect when made.  However, as explained below, none of Deutsche Bank's arguments finds support within the text of the Amended Credit Agreement or the evidence in the record, and therefore this Court finds that no "Event of Default" or "Default" had occurred as of the time that Genuity served the banks with Notice of Borrowing for the July Advance.  Therefore, the Court finds that Deutsche Bank breached the Amended Credit Agreement when it failed to forward the July Advance.  In addition, the Court finds no merit in Deutsche Bank's argument that the settlement of the lawsuit filed against it by Genuity has *res judicata* effect over the issue of whether or not Deutsche Bank breached its obligations pursuant to the Amended Credit Agreement by not funding the July Advance.

1.     *Verizon Had Not Yet Triggered an "Event of Default" by Canceling Its Option to Reacquire Genuity, and Genuity's Request for Funds Did Not Create a "Default" by Bringing About Verizon's Decision.*

Deutsche Bank contends that it did not breach the Amended Credit Agreement despite its failure to fund the July Advance because either 1) Verizon had already cancelled its option to reacquire Genuity ("the Verizon Option"), thus creating an "Event of Default" pursuant to Section 6.01 of the Amended Credit Agreement; or 2) Genuity's decision to request the July Advance caused a "Default" pursuant to Section 3.02 of the Amended Credit Agreement[1] because it triggered Verizon's decision to cancel the Verizon Option.  In either event, Deutsche Bank contends that it was no longer obligated to fund the July Advance.

a.     No "Event of Default" Related to the Verizon Option

Section 6.01(g) of the Amended Credit Agreement pertains to the Verizon Option, and it defines the "Event of Default" related to the Verizon Option as follows:

> (i) Verizon shall cease, prior to the exercise of the Verizon Option, to control, directly or indirectly, a sufficient number of shares of the Borrower's capital stock such that, upon exercise of the Verizon Option, Verizon would own, directly or indirectly, at least 50% of the combined voting power of all Voting Stock of the Borrower; or (ii) the Verizon Option is cancelled or becomes invalid or unenforceable (other than upon the exercise thereof) . . . ; or (iii) after the exercise of the Verizon Option, Verizon shall cease to own, directly or indirectly, at least 50% of the combined voting power of all Voting Stock of the Borrower.

(Id. § 6.01(g).)  Thus, if any of the circumstances described in Section 6.01(g) had arisen prior to the time at which Genuity requested the July Advance – the morning of July 22, 2002 – Deutsche Bank would not have been contractually obligated to fund the July Advance.

---

[1] A "Default" pursuant to Section 3.02 of the Amended Credit Agreement is different from an "Event of Default" pursuant to Section 6.01 as set forth infra at Section III.B.1.b. of this Opinion & Order.

Deutsche Bank and JPMorgan Chase now dispute the timing of the cancellation of the Verizon Option. JPMorgan Chase contends that "[o]n July 24, 2002 at approximately 4:30 p.m., an Event of Default under the Amended Credit Agreement occurred, when Verizon cancelled its option to reacquire Genuity." (Def.'s 56.1 ¶ 8.) However, Deutsche Bank contends that although Verizon "formally extinguished" its option to reacquire Genuity on July 24, 2002 at 4:30 p.m., it actually cancelled that option "prior to that time." (Pl.'s 56.1 Counter Statement ¶ 8.)

Deutsche Bank contends that an "Event of Default" existed as of July 18, 2002 due to a July 17 decision by Verizon to write down the value of Genuity equity and debt in Verizon's second quarter financial statements, which were scheduled to be released on July 31. (Wohl Aff., Ex. 49, Plaintiff Deutsche Bank AG's Responses and Objections to Defendant JPMorgan Chase's Third Set of Interrogatories dated May 5, 2006, Response No. 10(c); Kobre Decl., Ex. 64, "Verizon Chronology" dated October 4, 2002, at GLT 002217.) In support of this claim, Deutsche Bank relies on a document prepared by the law firm Shearman & Sterling LLP – counsel to Agent JPMorgan Chase – which is entitled "Summary Chronology of Events Leading Up to Verizon's July 25, 2002 Public Announcement That it Would Not Reintegrate Genuity," and which describes the July 17 meeting at which the decision to write down the debt was made. (Kobre Decl., Ex. 64, at GLT 002217.) However, Deutsche Bank neglects to recognize that this same description of the July 17 meeting also states that the participants were not deciding "whether to reintegrate Genuity" at that time, but merely asked that a "final analysis" of that decision be presented at a scheduled July 25, 2002 meeting of the Corporate Leadership Council. (Id.) The Shearman & Sterling summary clearly shows that as of July 17, Verizon had made a

decision regarding the "write down," but had not yet decided how to proceed with respect to reintegration.  (See id.; see also Wohl Aff., Ex. 67, O'Brien Aff. ¶ 8.)

In addition, the Shearman & Sterling document upon which Deutsche Bank relies in fact provides support for JPMorgan Chase's position that the "Event of Default" did not occur until the Verizon Board of Directors on July 24 voted to cancel the Verizon Option.  The document contains an entry for the July 24 meeting of the Verizon Board of Directors which states:

> [The Verizon CEO] makes presentation and recommends conversion of class B shares to Class A, which would negate Verizon's ability to reintegrate Genuity.  The conversion would also trigger an event of default under the Verizon credit facility.
>
> The board accepts [the CEO's] recommendation and urges management to act as quickly as possible to protect Verizon against the possibility that Genuity would draw the remaining $850 million.  [Verizon executives] emphasize the need for confidentiality and advise that any leak before the close of business could lead Genuity to draw the $850 million from Verizon before the conversion is effective.

(Id. at GLT 002222.)  The fact that the board was concerned about the possibility that Genuity might draw on the Verizon credit facility on July 24 demonstrates that the Verizon Option was indeed still in effect on that date.[2]  Thus, the evidence relied on by Deutsche Bank fails to concretely support its contention that an "Event of Default" occurred prior to July 22, 2002 when Genuity requested the Revolver Advance from the nine banks.

In contrast to Deutsche Bank's speculative claims, JPMorgan Chase points to evidence within the record that Verizon had not cancelled its option to reintegrate Genuity as of the time

---

[2] Although Deutsche Bank seeks support for its position in an excerpt from the deposition of a Verizon executive, the testimony makes it clear that although the witness personally believed prior to July 22 that Verizon should cancel the Verizon Option, he was explicit that no Verizon board decision had been made regarding the integration of Genuity as of the July Advance.  (See Kobre Decl., Ex. 66, Giammarino 1/14/03 Dep. at 106:2-6; Reply Affidavit of Frank H. Wohl in Support of Defendant-Counterclaim-Plaintiff JPMorgan Chase Bank's Motion for Summary Judgment and in Opposition to Deutsche Bank's Summary Judgment Motion dated Aug. 16, 2006 ("Wohl Reply Aff."), Ex. 14, Giammarino 1/14/03 Dep. at 120:25-121:8.)

Genuity requested the Revolver Advance on July 22, 2002.  Indeed, as noted above, the record

demonstrates that the Verizon Board of Directors did not cancel the Verizon Option until a

telephone meeting on July 24, 2002 at which Verizon's CEO explained that Verizon

management had concluded that it was not in the best interest of Verizon for it to reintegrate

Genuity and the board agreed to cancel the Verizon Option.  (Wohl Reply Aff., Ex. 11, Masin

1/16/03 Dep. at 106:21-110:19; Wohl Aff., Ex. 34, Minutes of Meeting of Board of Directors of

Verizon, July 24, 2002.)[3]  According to William F. Heitmann, a member of Verizon senior

management, "the decision not to reintegrate would have been a board decision" and the board

meeting regarding this decision took place by telephone on July 24, 2002.  (Wohl Reply Aff., Ex.

15, Heitmann 1/14/05 Dep. at 259:3-260:2.)[4]

In addition, JPMorgan Chase has provided persuasive evidence that Genuity employees

did not know of Verizon's plans until Verizon officially cancelled its option to reintegrate

Genuity.  For example, Genuity Chief Financial Officer Patrick O'Brien testified that:

> At no time before July 24, 2002, at approximately 4:30 P.M., did I know
> whether or not Verizon was going to reintegrate Genuity.  I am not aware
> of any Genuity officer, director or employee who knew of any decision by
> Verizon concerning reintegration prior to July 24, 2002 at approximately
> 4:30 P.M.

(Wohl Aff., Ex. 67, Affidavit of Patrick O'Brien dated Apr. 24, 2006, ¶ 16; see also Wohl Aff.,

Ex. 68, Affidavit of Roger A. Kuebel dated June 8, 2006, ¶ 11.)  Deutsche Bank has presented no

credible evidence to rebut these statements.  As noted above, the Verizon Chronology prepared

---

[3] Deutsche Bank points to the fact that Michael Masin, a Verizon employee and Genuity Board member, did not
attend the Genuity Board meetings on July 18 and July 22, 2002, and based on this surmises that Verizon
had decided to cancel the Verizon Option before July 22, 2002.  However, Masin testified that that was not his reason for
not attending the meetings.  (Wohl Reply Aff., Ex. 13, Masin 5/17/06 Dep. at 37:5-19, 45:24-46:7.)
[4] Deutsche Bank points to draft documents prepared on July 23 for the Verizon board meeting, but the deposition
testimony is uniform that those were drafts "prepared without the decision [to reintegrate Genuity] made, approved,
or authorized."  (Wohl Aff., Ex 54, Heitmann 1/14/05 Dep. at 271:10-20.)

by Shearman & Sterling shows that Verizon executives were concerned as of July 24, 2002 that "any leak before the close of business could lead Genuity to draw the $850 million from Verizon before the conversion is effective."  (Kobre Decl., Ex. 64, "Verizon Chronology" at GLT 002222.)

Accordingly, there is no material issue of fact with respect to the timing of Verizon's cancellation of its option to reintegrate Genuity.  Deutsche Bank has inappropriately "rel[ied] on mere conclusory allegations or speculation" in support of its factual assertions, which is insufficient to survive JPMorgan Chase's motion for summary judgment in its favor.  D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998).  The facts show that Verizon cancelled its option to reacquire Genuity on July 24, 2002 – two days after Genuity requested an advance from Deutsche Bank and the other lending banks.

b.        No "Default" Related to the Verizon Option

Deutsche Bank advances the alternative argument that even if the Verizon Option were not cancelled until July 24, 2002, that cancellation "resulted from" Genuity's Notice of the July Advance made two days earlier.  With this argument, Deutsche Bank seeks to invoke the language of Section 3.02 of the Amended Credit Agreement that a bank's obligation to advance funds is subject to the condition precedent that "no event has occurred and is continuing, or would result from such Revolving Credit Borrowing . . . that constitutes a Default."  (Wohl Aff., Ex. 2, § 3.02(b) (emphasis added).)  The Amended Credit Agreement defines "Default" as "any Event of Default or any event that would constitute an Event of Default but for the requirement that notice be given or time elapse or both."  (Id. § 1.01) (emphasis added.)  However, in order to rely on these two provisions, Deutsche Bank attempts to conflate the word "would" with either the word "may" or "could."  To the contrary, the U.S. Court of Appeals for the Second Circuit

22

has recognized that the word "would" connotes definiteness, not mere possibility.  Kennecott Copper Corp. v. Curtiss-Wright Corp., 584 F.2d 1195, 1201-02 (2d Cir. 1978) (discussing whether certain banks "would" require repayment of certain loans).

Deutsche Bank's reliance on Section 3.02 is misplaced.  The most obvious example of a "Default" that "would result" – with certainty – from an advance of funds is a draw on a credit facility that would place Genuity out of compliance with Section 5.03 of the Amended Credit Agreement, which requires that Genuity maintain a certain dept to capital ratio.  (Wohl Aff., Ex. 2, Amended Credit Agreement §5.03.)

At most, Deutsche Bank can only point to evidence that Genuity's decision to request the funds from the nine banks caused Verizon to "begin a series of conversations and accelerations" around whether or not to exercise the Verizon Option.  (Wohl Reply Aff., Ex. 39, Heitmann 10/24/05 Dep. at 183:18-21; Ex. 14, Giammarino 1/14/03 Dep. at 131:14-21.)  However, the record simply contains no evidence that Verizon's decision not to reacquire Genuity was the ineluctable result of the July Advance.  In addition, Deutsche Bank claims that Genuity's own treasurer – Roger A. Kuebel – predicted that the July Advance would bring about the cancellation of the Verizon Option.  To the contrary, however, Kuebel testified that when he signed the Notice for the July Advance, he "still believed that reintegration was the most likely outcome, and that the draw would not cause Verizon to cancel the option."  (Wohl Aff., Ex. 68, Kuebel Aff. ¶ 12.)  Accordingly, the Court finds that no "Default" occurred as a result of the July Advance because the record does not support Deutsche Bank's contention that that July Advance "would result" – with certainty – in the cancellation of the Verizon Option.

Thus, this Court finds that no "Event of Default" or "Default" related to the Verizon Option had occurred in connection with Genuity's July 22, 2004 Notice for a Revolver Advance.

Therefore, Deutsche Bank was obligated by the Amended Credit Agreement to forward its pro rata share of the July Advance, and its failure to do so constituted a breach of its contractual obligations.

        2.    *Deutsche Bank's Dissatisfaction with Genuity's Requests for Information Did Not Constitute an "Event of Default."*

Deutsche Bank also contends that its failure to fund the July Advance was justified by its dissatisfaction with Genuity's responses to certain requests for information that Deutsche Bank made shortly <u>after</u> Genuity gave Notice of the July Advance.  Deutsche Bank points to Section 5.01(i)(vi) of the Amended Credit Agreement, which requires Genuity to furnish certain financial reports at specified times, as well as "such other information respecting the Borrower . . . as any Lender Party through the Agent may from time to time reasonably request."  (Wohl Aff., Ex. 2, Amended Credit Agreement § 5.01(i)(vi).)  In addition, Section 6.01(c) provides that an "Event of Default" occurs when Genuity fails to provide that information and the failure goes unremedied for five business days.  (<u>Id.</u>, § 6.01(c).)

Here, Deutsche Bank contends that it began requesting additional information from Genuity on the morning of July 22, 2002 after the Notice of the July Advance had been sent. (Kobre Decl., Ex. 92, Aff. of Roger A. Kuebel.)   Deutsche Bank points to oral questions presented to Genuity over a telephone call that morning, and these questions do not comply with the provision of Section 5.01 requiring that requests for information about the borrower be sent in writing through the Agent.  (<u>See</u> Wohl Aff., Ex. 2, Amended Credit Agreement § 5.01(i)(vi).)

Deutsche Bank did not make its first written request for information until much later on July 22.  Deutsche Bank sent two separate written requests seeking additional information from Genuity.  (Kobre Decl., Ex. 51, July 22, 2002 letter from Neumeier & Satl to Coleman; Ex. 52,

July 23, 2002 letter from Neumeier & Satl to O'Brien & Kuebel.)  The first of the two letters –
which was faxed at 7:14 p.m. on July 22, 2002 – was sent through JPMorgan Chase, and
therefore complies with the requirements of Section 5.01(i)(vi) that requests be made through the
Agent.  The letter dated the next day – July 23 – was sent directly to Genuity without going
through the Agent, and therefore does not comply with Section 5.01(i)(vi).  The Court finds that
the first letter – dated July 22 – commenced the five business day period pursuant to the
Amended Credit Agreement in which Genuity could respond.  This five day period expired on
July 29, 2002, and therefore by the plain terms of Section 6.01(c), no "Event of Default" could
have occurred due to Genuity's failure to provide information prior to that date.  Thus, no "Event
of Default" had occurred prior to noon on July 22 – the time at which Deutsche Bank was
obligated by the Amended Credit Agreement to fund the Revolver Advance.

　　　Indeed, Deutsche Bank's contention – that Genuity's failure to respond caused an "Event
of Default" that absolved Deutsche Bank of its obligation to fund – is severely undercut by the
fact that Deutsche Bank did not even make its official request for information pursuant to
Section 5.01 until the evening of July 22, when it had already missed the noon deadline to fund.

　　　Moreover, while the parties agree that the Amended Credit Agreement entitles the
lending banks to make reasonable requests for information from Genuity from time to time,
Section 5.01 does not state that such a request may constitute a precondition for funding.  (See
Wohl Aff., Ex. 2, Amended Credit Agreement § 5.01.)  Indeed, the sections of the Amended
Credit Agreement that detail the banks' funding obligations do not allow a bank to delay or
refuse to fund a requested advance pending the Borrower's provision of responses that the bank
deems necessary or acceptable.  (See id. §§ 3.02, 4.01.)  Nor would Deutsche Bank's
interpretation of the portions of the Amended Credit Agreement pertaining to requested

information fit the purpose of the revolving credit facility, which is meant to have funds committed and available to Genuity with as little as same-day notice.  Indeed, Section 2.02 – which sets forth the requirements for Genuity to give the banks notice that it will seek a revolving credit advance – would be rendered meaningless if, despite Genuity's use of the form annexed at Exhibit B-1 to the Amended Credit Agreement, a bank could claim the notice to be inadequate and impose additional information requirements as preconditions for funding.  Accordingly, Genuity did not cause an "Event of Default" pursuant to Section 6.01 of the Amended Credit Agreement by failing to provide Deutsche Bank with the information it requested after the Notice of July Advance had been given.

> 3.  *The Record Does Not Support Deutsche Bank's Contention that Genuity Made Incorrect Representations in Connection with the July Advance, and Therefore Deutsche Bank Has Not Shown an "Event of Default."*

Deutsche Bank also claims that Genuity triggered an "Event of Default" pursuant to the Amended Credit Agreement by making allegedly false statements in connection with its request for the July Advance.  Section 6.01(b) provides that an "Event of Default" occurs if Genuity makes "any representation or warranty . . . in connection with" the Amended Credit Agreement that "shall prove to have been incorrect in any material respect when made or deemed made." (Id. § 6.01(b).)  Specifically, Deutsche Bank points to:  1) Genuity's statements, made months prior to the July Advance, that it did not expect to draw on the credit facility until the fall of 2002; 2) Genuity's failure to live up to a "commitment" to draw on its Verizon credit facility *pari passu* – "at an equal pace" or "side by side" – with its draw under the banks' credit facility; and 3) Genuity's allegedly false responses to questions from the lending banks about Genuity's reasons for the July Advance.  However, as explained below, the facts in the record provide no support for Deutsche Bank's contention that certain Genuity statements were "incorrect in any

26

material respect when made," and therefore this Court finds no "Event of Default" had occurred

pursuant to Section 6.01(b) of the Amended Credit Agreement.

        a.      Statements that Genuity Did Not Expect to Draw on the Credit
                    Facility Until the Fall of 2002

This Court finds no merit in Deutsche Bank's argument that any statement by Genuity

that it did not expect to draw on the bank's credit facility until the fall of 2002 was "incorrect."

Indeed, Deutsche Bank can point only to documents that show that in May, 2002, Genuity

represented that it "anticipate[d] next draw down in Q4 or late Q3," (Kobre Decl., Ex. 22,

"Genuity Inc. Bank Group Review" dated May 2002), but such statements do not constitute a

warranty or representation that Genuity was binding itself not to draw down on the credit facility

until "late Q3."  Deutsche Bank points to no portion of the Amended Credit Agreement in which

Genuity makes any commitment that it would not borrow on the facility before the fall of 2002.

The text of the Amended Credit Agreement in fact states that the funds were available to Genuity

"on any Business Day during the period from the Restatement Effective Date until the

Termination Date," or more specifically, for the time period beginning on September 24, 2001

through September 5, 2005.  (Wohl Aff., Ex. 2, Amended Credit Agreement § 2.01.)  In light of

these contractual provisions, this Court will not find that a Genuity statement about when it

anticipated drawing on the credit facility was materially incorrect when made.  Accordingly,

Genuity's statements do not constitute an "Event of Default" pursuant to the Amended Credit

Agreement.

        b.      Statements that Genuity Committed Itself to Draw on Its Verizon
                    Credit Facility *Pari Passu* with Its Credit Facility with the Banks

Similarly, Deutsche Bank can point to no portion of the Amended Credit Agreement in

which Genuity makes any commitment to draw on the credit facility with the lending banks *pari*

*passu* with its draws on the Verizon credit facility.  (See Wohl Aff., Ex. 2.)  Indeed, in Deutsche

Bank's own credit report for Genuity, Deutsche Bank explicitly acknowledges that:

> Verizon currently provides $1.15bn of funded financing to Genuity.
> Additional financing needs of Genuity are expected to be funded by equal
> pro rata step-ups of Verizon and the banks.  However, the credit
> documentation does not stipulate this pro rata requirement and the bank
> group relies on verbal statements from Verizon.

(Wohl Aff., Ex. 4, Credit Report, DB001217; see also Kobre Decl., Ex. 16, Doyle 11/3/05 Dep.

at 55:19-56:2; Kobre Decl., Ex. 22.)  However, such statements cannot constitute material

misrepresentations when they were worded so conditionally, and moreover, when nothing in the

plain text of the Amended Credit Agreement prevented Genuity from drawing on the bank credit

facility alone and not from the Verizon facility.  As one witness explained, "it was our

expectation that they would draw [from the lending banks] to the same level [as from Verizon],

but . . . I don't think there was any requirement . . . in writing or otherwise that that happen."

(Kobre Decl., Ex. 17, Bingham 9/27/05 Dep. at 58:23-59.)

 Notably, during the negotiations leading to the Amended Credit Agreement, Deutsche

Bank had attempted to secure a written commitment concerning *pari passu* funding.  (Wohl Aff.,

Ex. 8, Sept. 19, 2001 e-mail from Andreas Neumeier, DB002221; Ex. 4, Sept. 25, 2001 Deutsche

Bank Group Credit Report, DB001217.)  However, Genuity and Verizon rejected this proposed

change – as well as several others suggested by Deutsche Bank – because of their concern that

any such changes "would potentially undermine the absolute availability of the facility on which

the transaction is built."  (Wohl Aff., Ex. 8, DB002221.)  Accordingly, Genuity never bound

itself to draw *pari passu* from the two credit facilities, and Genuity's decision not to maintain

*pari passu* funding does not constitute an "Event of Default" pursuant to the Amended Credit Agreement.[5]

        c.        Allegedly False Statements Regarding Genuity's Reasons for Requesting the July Advance

Finally, Deutsche Bank contends that Genuity caused an "Event of Default" when it made materially false statements to the banks that the purpose of requesting the July Advance was to reassure its customers by adding cash to its balance sheets.  (See Kobre Decl., Ex 32, Cohen 4/19/06 Dep. at 111:24-112:7; Ex. 4, Nason 3/16/06 Dep. at 87:9-21.)  In attempting to refute the truthfulness of such statements, Deutsche Banks points to an affidavit signed by Genuity treasurer Kuebel that reads as follows:

> I understood that Genuity decided to draw funds under the Amended and Restated Credit Agreement in July 2002 as an "insurance policy," because Genuity was concerned that Verizon might in fact cancel its option to reintegrate Genuity.  I do not recall any other reason.

(Kobre Decl., Ex. 92, Affidavit of Roger A. Kuebel dated Mar. 21, 2006, ¶ 12.)  As is clear from the statement, however, Kuebel did not testify that Genuity's concern over the possible cancellation of the Verizon Option was in fact the only reason for the drawing on the credit facility with the banks.  Moreover, this statement does not reflect the totality of Kuebel's testimony on this particular topic, which is as follows:

> In July 2002, I and others at Genuity explained to the bank group, Verizon and the public that the reason for the draw was to demonstrate Genuity's financial stability and show cash on Genuity's balance sheet.  I believed at the time, and still believe, that was a true and valid reason.

---

[5] Deutsche Bank also points to testimony that <u>Verizon</u> had made representations to the banks that it was willing to fund advances to Genuity *pari passu* with the advances made by the lending banks.  (Kobre Decl., Ex. 15, Marley 10/27/05 Dep. at 49:4-51:18; Ex. 19, Heitmann 10/24/05 Dep. at 38:11-15.)  However, Verizon was not a party to the Amended Credit Agreement between Genuity and the banks, and such a statement could not possibly result in an "Event of Default" pursuant to Section 6.01 of the Amended Credit Agreement.

(Wohl Aff., Ex. 68, Affidavit of Roger A. Kuebel dated June 8, 2006, ¶ 9.)  Deutsche Bank

cannot point to credible facts to support its contention that Genuity made any materially

misleading statements with respect to its reasons for seeking the July Advance. [6]

        4.      *Res Judicata Does Not Prevent This Court from Adjudicating the Issue of*
               *Whether Deutsche Bank Breached the Amended Credit Agreement.*

Deutsche Bank contends that JPMorgan Chase is precluded from arguing that Deutsche

Bank breached the Amended Credit Agreement by not forwarding the July Advance under the

doctrine of *res judicata* because that issue was settled as part of the Genuity bankruptcy

proceeding.  Specifically, on January 23, 2003, the bankruptcy court signed an Order approving

the settlement agreement between Deutsche Bank and Genuity resolving with prejudice its

breach of contract lawsuit against Deutsche Bank in the U.S. District Court for the District of

Massachusetts.  (See Kobre Decl., Ex. 76, Order in In re Genuity Inc., et al., No. 02-43558

(Bankr. S.D.N.Y. Jan. 23, 2003), ¶ 2 (hereinafter the "Settlement Order").)  None of the other

banks were parties to the action that was settled in that Order.

The doctrine of *res judicata* "ensures the finality of decisions" by preventing a party from

relitigating a claim that has already been decided.  Brown v. Felsen, 442 U.S. 127, 131, 99 S. Ct.

2205, 60 L. Ed. 2d 767 (1979).  Pursuant to that doctrine, "a final judgment on the merits bars

further claims by parties or their privies based on the same cause of action."  Montana v. United

States, 440 U.S. 147, 153, 99 S. Ct. 970, 59 L. Ed. 2d 210 (1979).  *Res judicata* operates "if the

---

[6] Deutsche Bank also points, as proof that the banks were misled, to a Genuity "script" that Genuity employees had prepared in advance of their July 22, 2002 conversations with the lending banks.  However, the very script upon which Deutsche Bank relies states that Genuity was to inform the banks that their "[c]ustomers want to see cash on [their] balance sheet, and this is particularly true for potential customers whose current provider is in financial distress."  (Kobre Decl., Ex. 42, at GLT 009518.)  Hence, the evidence relied upon by Deutsche Bank undercuts its own argument.

second cause of action requires the same evidence to support it and is based on facts that were also present in the first." Maharaj v. BankAmerica Corp., 128 F.3d 94, 97 (2d Cir. 1997). Thus, for a claim to be dismissed on the ground of *res judicata*, the party asserting the defense must "show that (1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." Monahan v. New York City Dep't of Corrections, 214 F.3d 275, 285 (2d Cir. 2000) (citations omitted); see also Israel v. Carpenter, 120 F.3d 361, 365 (2d Cir. 1997) (preclusive effect given to claims resolved in a stipulation).

However, the text of the Order of the bankruptcy court shows that it resolved only the dispute between Genuity and Deutsche Bank by granting Deutsche Bank a general unsecured claim in the Genuity bankruptcy proceeding, but did not resolve the inter-bank dispute over the distribution of funds. The Order stated, in part:

> Without prejudice to any and all rights of Deutsche Bank, except as further provided hereby, Deutsche Bank is hereby granted *an allowed general unsecured claim in the cases of the Debtors Genuity Inc., Genuity Solutions Inc., and Genuity Telecom Inc.*, in the amount of $172,000,000; provided, however, that the Debtors retain all rights to object to such claims and seek subordination thereof, except on the grounds that such claims do not constitute indebtedness; and, provided, further, that all other parties in interest, including, without limitation, the Creditors' Committee (on behalf of the unsecured creditors or the estates), retain all objections, defenses, counterclaims and other rights (the "Retained Rights") *with respect to such claims*, except to the extent that the Debtors' rights or the Retained Rights relate in any way to the DB Action or the claims or issues asserted against DB therein, all of which are fully and finally settled with prejudice hereby.

(Kobre Decl., Ex. 76, Settlement Order, ¶ 3 (emphasis added).) This text makes clear that the settlement implicates only the Creditors' Committee's "objections, defenses, counterclaims and

other rights" relating to Deutsche Bank's "allowed general unsecured claim" in bankruptcy.  (See id.)

In addition, statements by the bankruptcy judge and lawyers for all parties make clear that every one was leaving the dispute raised in this action to another day.  In Genuity's papers supporting its motion to approve the settlement of the District of Massachusetts action with Deutsche Bank, Genuity wrote that pursuant to the settlement, "[a]ll other parties in interest retain all claims and objections with respect to Deutsche Bank."  (Wohl Reply Aff., Ex. 43, Debtor's Emergency Motion for Order Under 11 U.S.C. § 363 and Fed. R. Bankr. P. 9019 Approving a Settlement Agreement with Deutsche Bank AG, ¶¶ 2, 27.)  Indeed, the Genuity Chief Financial Officer, who signed the settlement agreement with Deutsche Bank, testified:

> When I signed the Settlement Agreement, I understood that the Settlement Agreement only settled the dispute between Genuity and Deutsche Bank arising out of Deutsche Bank's failure to fund the July Draw.  I did not understand the Settlement Agreement to adjudicate any rights other than those of Genuity or Deutsche Bank.

(Wohl Aff., Ex. 67, O'Brien Aff. ¶ 37.)

In the months that followed, as the bankruptcy plan was negotiated, the parties and the bankruptcy court made additional comments that the plan was not designed to resolve the dispute in this action.  For example, on September 30, 2003, the bankruptcy court observed, "I don't think that the plan should have any impact on [the inter-bank dispute]."  (Wohl Reply Aff., Ex. 41, Transcript of Sept. 30, 2003 Hearing to Consider Approval of Debtors' Disclosure Statement at 6:14-15.)  Deutsche Bank's attorney "agree[d] that it is an issue for another day."  (Id. at 10:10-11.)  Similarly, at a subsequent hearing on November 17, 2003, the following colloquy transpired in response to an attempt by Deutsche Bank's counsel to seek a distribution on its allowed claim:

Court:          So you are trying to get a greater distribution by 16 percent
                than the other banks.

Mr. Dombroff [Counsel for Deutsche Bank]:

                I am not asking that in this Court.  That is an issue for another
                day in another Court.

                . . . .

[Mr. Willett, Counsel for Deutsche Bank]:

                As Mr. Dombroff has conceded and as the debtor has
                maintained, at the end of that distribution, the fight begins in
                some other Court.  So the estate is free of it.  We go ahead and
                confirm today and no one has lost any rights.

(Wohl Reply Aff., Ex. 34, Transcript of Nov. 17, 2003 Hearing of Debtors' Motion for an Order

Approving Debtors' Joint Consolidated Plan of Liquidation as Modified dated Nov. 14, 2003, at

62:15-20, 68:14-19.)  At the same hearing, the judge drew a sharp distinction between Deutsche

Bank's allowed claim and the issue of distribution between the banks:

                While certainly Deutsche Bank had a right to file a separate claim, this
                Court can and will direct that the dividend be paid exclusively to the
                agent; and if Deutsche Bank finds itself aggrieved by that result because it
                believes the agent will make a distribution in a fashion that it believes is
                inappropriate, it certainly has a number of court remedies that it may take
                to deal with that. That is not an issue which the debtors should resolve
                under the plan, although the plan is, indeed, structured in a fashion which I
                believe was intended by the parties to provide for the repayment of the
                balance of the advances before any payments were to be made on the letter
                of credit.

(Wohl Reply Aff., Ex. 34, at 109:22-110:24.)

        Finally, the bankruptcy court's Order overruling Deutsche Bank's objections was clear

that the Order had no effect on the inter-bank dispute.  That Order provided that "[t]he court has

made no ruling as to Deutsche Bank's right to distribution from the initial distribution or any

other distribution."  (Wohl Reply Aff., Ex. 37, Order on (1) Limited Responses of JPMorgan

Chase Bank, as Administrative Agent, to Initial Objection of Deutsche Bank AG to Confirmation of Debtor's Joint Consolidated Plan of Liquidation and Motion under [11] U.S.C. § 510 to Subordinate Certain Claims of Deutsche Bank and (2) Deutsche Bank AG's Motion for Stay Pending Appeal ("Objection Order") dated Nov. 20, 2003, ¶ 2.)

That same Order later states, "[n]othing in this order shall be deemed to constitute a waiver or release of any rights . . . claims, or causes of action of the Bank Agent against the Bank Lenders or any Bank Lender against the Bank Agent or against any other Bank Lender." (Id. ¶ 6.) The subsequent Order confirming the bankruptcy plan was to the same effect. (Kobre Decl., Ex. 86, Order Confirming Debtors' Joint Consolidated Plan of Liquidation, as Modified dated November 21, 2003, ¶ 22(c).) Specifically, the relevant portion states: "[N]either this paragraph nor any other provision of the Plan shall be deemed to constitute a waiver or release of any rights (including Bank Agent fee and expense reimbursement and indemnification rights under the Bank Credit Agreement), claims, or causes of action of the Bank Agent against the Bank Lenders or of any Bank Lender against the Bank Agent or against any other Bank Lender or of Verizon pursuant to Verizon's participation in the Bank Credit Agreement." (Id. ¶ 22(c).)

Later, when Deutsche Bank appealed the November 20, 2003 Order of the bankruptcy court overruling Deutsche Bank's objections, Judge John G. Koeltl of the U.S. District Court for the Southern District of New York affirmed the bankruptcy court's rulings, and in the process, explicitly and repeatedly recognized that the dispute between Deutsche Bank and the other lenders remained unresolved: "Instead of deciding how the money should be divided, the bankruptcy court approved the Plan's method of making the entire Class 3 distribution to Chase as agent, thus allowing the Lenders to resolve the dispute over the funds among themselves in

34

the appropriate forum." (Wohl Aff. Ex. 47, Order in <u>Deutsche Bank AG v. GLT Liquidating</u>

<u>Trust and JPMorgan Chase Bank</u>, No. 04 Civ. 00591, at 5-6 (S.D.N.Y. Aug. 4, 2004).)

Later in the same Order, the district judge wrote that:

> It is plain that the Bankruptcy Court was not asked to decide the merits of the inter-bank dispute and specifically was not asked to determine the validity of Amendment No. 1 to the Credit Agreement. The parties have also made it clear that this court is not being asked to decide that substantial dispute. Designating Chase as agent was consistent with the Lenders' pre-existing relationship, was the most efficient way to confirm the Plan without involving the debtor in the inter-Lender dispute, and is in no way prejudicial to the substantive rights of Deutsche Bank and its ability to adjudicate its dispute with the other Lenders in an appropriate forum.

(Id. at 10-11.)

In sum, the relevant orders of the bankruptcy court and U.S. District Court, as well as the

evidence of the statements of the parties' attorneys from the hearings related to those orders, all

provide this Court with a record that the Genuity bankruptcy proceedings did not result in a final

determination of the inter-bank dispute at issue in this action. Accordingly, *res judicata* does not

prevent this Court from finding that Deutsche Bank defaulted on its obligations pursuant to the

Amended Credit Agreement when it failed to forward to Genuity the July Advance.

C.      <u>JPMorgan Chase's Proposed Distribution Is "Ratable" Pursuant to the Amended Credit Agreement, and that Distribution Is Not Affected by This Court's Determination as to the Validity of Amendment No. 1.</u>

1.      *JPMorgan Chase's Proposed Distribution Is "Ratable" Pursuant to the Amended Credit Agreement.*

Section 2.14 of the Amended Credit Agreement directs Genuity to repay advances by

making payment to the administrative Agent – JPMorgan Chase – and obligates JPMorgan

Chase to distribute such payments to all lenders "ratably." (Pl.'s 56.1 ¶ 2; Def.'s 56.1 Counter

Statement ¶ 2.) The parties disagree as to what "ratably" means. Deutsche Bank contends that

the term "ratably" means "in proportion to the total amount that each lender has advanced to Genuity." (Pl.'s 56.1 ¶ 2.) JPMorgan Chase contends that the term "ratably" requires that the distribution by the Agent must "tak[e] into account a Lender's performance of its commitments and failure to perform its commitments." (Def.'s 56.1 Counter Statement ¶ 2.) While the terms "ratable" and "ratably" are not defined in the Amended Credit Agreement (see Wohl Aff., Ex. 2, Art. I, "Definitions and Accounting Terms"), the Court notes that the commonly accepted definition of "ratable" is "proportional," White v. Knox, 111 U.S. 784, 786, 4 S. Ct. 686; 28 L. Ed. 603 (1884), or "proportionate," Black's Law Dictionary at 1268 (7th ed. 1999). Accordingly, this Court must determine which of the parties' proposed distributions of funds is in fact "ratable" or "proportional."

The Court begins this analysis by noting that Section 7.01 of the Amended Credit Agreement provides the Agent a broad grant of authority:

> Authorization and Action. Each Lender Party . . . hereby appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers and discretion under this Agreement as are delegated to the Agent by the terms hereof, together with such powers and discretion as are reasonably incidental thereto.

(Wohl Aff., Ex. 2, Amended Credit Agreement § 7.01.) JPMorgan Chase contends that pursuant to its "powers and discretion" as Agent, it has properly construed "ratable" to mean in proportion to both the banks' original commitments and the banks' performance of their obligations. Specifically, JPMorgan Chase's proposed distribution begins by recognizing that Deutsche Bank did not fund the July Advance. Accordingly, in order to distribute the funds "ratably," JPMorgan Chase contends that it must first impute to Deutsche Bank a 100% recovery on the July Advance that it did not provide to Genuity. To do otherwise would give Deutsche Bank credit for sums it never expended. In other words, JPMorgan Chase maintains that Deutsche Bank has already

received a recovery of 100% of the $127.5 million July Advance that it did not make because it could not possibly be seeking to recover moneys it never expended.  Therefore, JPMorgan Chase contends it must distribute to the other banks a 100% recovery on the July Advance – which was the only Revolver Advance ever made – in order to bring the banks into parity with Deutsche Bank.  JPMorgan Chase argues that only after every bank has received 100% of the funds it advanced in the July Advance can the remaining funds be distributed on the Letter of Credit Advance, with each bank – including Deutsche Bank – receiving the same proportion of the amount that it funded when the demand was made on the banks to honor the Letter of Credit in November 2002.

Pursuant to JPMorgan Chase's proposed distribution, the total amounts allocated to each lender would be as follows:

**JPMORGAN CHASE'S PROPOSED DISTRIBUTION TO THE BANKS[7]**

| Lender | Revolver Advance Recovery | % | Letter of Credit Recovery | % | Total Recovery | % |
|---|---|---|---|---|---|---|
| JPMorgan Chase | $212,500,000.00 | 100% | $64,983,239.46 | 22.60% | $277,483,239.46 | 55.50% |
| Citicorp USA, Inc. | $127,500,000.00 | 100% | $38,989,943.67 | 22.60% | $166,489,943.67 | 55.50% |
| Credit Suisse First Boston | $127,500,000.00 | 100% | $38,989,943.67 | 22.60% | $166,489,943.67 | 55.50% |
| Deutsche Bank | $127,500,000.00 (imputed) | 100% | $38,989,943.67 | 22.60% | $166,489,943.67 (with $127,500,000.00 imputed) | 55.50% |
| BNP Paribas | $85,000,000.00 | 100% | $25,993,295.78 | 22.60% | $110,993,295.78 | 55.50% |
| The Bank of New York | $42,500,000.00 | 100% | $12,996,647.89 | 22.60% | $55,496,647.89 | 55.50% |
| Mizuho Corporate Bank, Ltd. | $42,500,000.00 | 100% | $12,996,647.89 | 22.60% | $55,496,647.89 | 55.50% |
| Toronto Dominion (Texas) Inc. | $42,500,000.00 | 100% | $12,996,647.89 | 22.60% | $55,496,647.89 | 55.50% |
| Wachovia Bank, N.A. | $42,500,000.00 | 100% | $12,996,647.89 | 22.60% | $55,496,647.89 | 55.50% |
| Total: | $850,000,000.00 | | $259,932,957.81 | | $1,109,932,957.81 | |

---

[7] Egbert Aff. ¶ 13.

Put differently, pursuant to JPMorgan Chase's proposed distribution, each bank would realize a percentage of the total recovery from Genuity that exactly matches the percentage of the original commitment that each bank agreed to in the Amended Credit Agreement as set forth below:

### PERCENT RECOVERY UNDER JPMORGAN CHASE'S PROPOSED DISTRIBUTION[8]

| Lender | Commitment | Percentage of Commitment | Total Recovery | Percentage of Recovery |
|---|---|---|---|---|
| JPMorgan Chase | $500,000,000.00 | 25% | $277,483,239.46 | 25% |
| Citicorp USA, Inc. | $300,000,000.00 | 15% | $166,489,943.67 | 15% |
| Credit Suisse First Boston | $300,000,000.00 | 15% | $166,489,943.67 | 15% |
| Deutsche Bank | $300,000,000.00 | 15% | $166,489,943.67 (with $127,500,000.00 imputed) | 15% |
| BNP Paribas | $200,000,000.00 | 10% | $110,993,295.78 | 10% |
| The Bank of New York | $100,000,000.00 | 5% | $55,496,647.89 | 5% |
| Mizuho Corporate Bank, Ltd. | $100,000,000.00 | 5% | $55,496,647.89 | 5% |
| Toronto Dominion (Texas) Inc. | $100,000,000.00 | 5% | $55,496,647.89 | 5% |
| Wachovia Bank, N.A. | $100,000,000.00 | 5% | $55,496,647.89 | 5% |
| Total: | $2,000,000,000.00 | 100% | $1,109,932,957.81 | 100% |

In contrast, Deutsche Bank's proposed distribution intentionally overlooks its failure to fund the July Advance, and consequently gives it a disproportionate realization. The effect of Deutsche Bank's proposed distribution – in which essentially the entire $47.6 million currently held in escrow would be distributed to it – is illustrated in the chart below:

### DEUTSCHE BANK'S PROPOSED DISTRIBUTION[9]

| Lender | Revolver Advance Recovery | % | Letter of Credit Recovery | % | Total Recovery | % |
|---|---|---|---|---|---|---|
| JPMorgan Chase | $198,500,000.00 | 93.41% | $64,983,239.46 | 22.60% | $263,483,239.46 | 52.70% |
| Citicorp USA, Inc. | $119,100,000.00 | 93.41% | $38,989,943.67 | 22.60% | $158,089,943.67 | 52.70% |
| Credit Suisse | $119,100,000.00 | 93.41% | $38,989,943.67 | 22.60% | $158,089,943.67 | 52.70% |

---

[8] See Egbert Aff. ¶ 14; J.P Morgan Chase's Mem. of Law in Support of its Motion for Summary Judgment at 22.
[9] Egbert Aff. ¶ 15.

| | | | | | | |
|---|---|---|---|---|---|---|
| First Boston | | | | | | |
| Deutsche Bank | $127,500,000.00 | 100% | $86,589,943.67 | 50.20% | $214,089,943.67 | 71.36% |
| BNP Paribas | $79,400,000.00 | 93.41% | $25,993,295.78 | 22.60% | $105,393,295.78 | 52.70% |
| The Bank of New York | $39,700,000.00 | 93.41% | $12,996,647.89 | 22.60% | $52,696,647.89 | 52.70% |
| Mizuho Corporate Bank, Ltd. | $39,700,000.00 | 93.41% | $12,996,647.89 | 22.60% | $52,696,647.89 | 52.70% |
| Toronto Dominion (Texas) Inc. | $39,700,000.00 | 93.41% | $12,996,647.89 | 22.60% | $52,696,647.89 | 52.70% |
| Wachovia Bank, N.A. | $39,700,000.00 | 93.41% | $12,996,647.89 | 22.60% | $52,696,647.89 | 52.70% |
| Total: | $802,400,000.00 | | $307,532,957.81 | | $1,109,932,957.81 | |

Thus, if the money currently held in escrow were given to Deutsche Bank, it would obtain a 71.36% recovery of its total commitment, whereas the other eight banks – the ones that adhered to all of the obligations placed on them by the Amended Credit Agreement – would realize only a 52.7% recovery.  Moreover, Deutsche Bank's proposal would yield for it a percentage recovery in excess of its original 15% commitment, as seen below:

**PERCENT RECOVERY PURSUANT TO DEUTSCHE BANK'S PROPOSED DISTRIBUTION[10]**

| Lender | Commitment | Percentage of Commitment | Total Recovery | Percentage of Recovery |
|---|---|---|---|---|
| JPMorgan Chase | $500,000,000.00 | 25% | $263,483,239.46 | 23.74% |
| Citicorp USA, Inc. | $300,000,000.00 | 15% | $158,089,943.67 | 14.24% |
| Credit Suisse First Boston | $300,000,000.00 | 15% | $158,089,943.67 | 14.24% |
| Deutsche Bank | $300,000,000.00 | 15% | $214,089,943.67 | 19.28% |
| BNP Paribas | $200,000,000.00 | 10% | $105,393,295.78 | 9.50% |
| The Bank of New York | $100,000,000.00 | 5% | $52,696,647.89 | 4.75% |
| Mizuho Corporate Bank, Ltd. | $100,000,000.00 | 5% | $52,696,647.89 | 4.75% |
| Toronto Dominion (Texas) Inc. | $100,000,000.00 | 5% | $52,696,647.89 | 4.75% |
| Wachovia Bank, N.A. | $100,000,000.00 | 5% | $52,696,647.89 | 4.75% |
| Total: | $2,000,000,000.00 | 100% | $1,109,932,957.81 | 100% |

---

[10] See Egbert Aff. ¶ 15.

In light of the discussion and figures noted above, the Court finds that JPMorgan Chase's proposed distribution is "ratable" pursuant to the Amended Credit Agreement. JPMorgan Chase's proposed distribution does not penalize Deutsche Bank for its failure to fund the July Advance. Instead, it merely achieves a result that brings Deutsche Bank's recovery on the revolver component and the letter of credit component of the credit facility with Genuity into parity with that of the other lenders. JPMorgan Chase's proposed distribution takes into account that Deutsche Bank is not similarly situated to the other banks because only Deutsche Bank failed to pay the July Advance. Because JPMorgan Chase's proposed distribution takes into account Deutsche Bank's withheld advance, it yields Deutsche Bank precisely the same percentage – 15% – as its original percentage commitment on the $2 billion Genuity credit facility pursuant to the Amended Credit Agreement. Under this distribution, Deutsche Bank also receives the same percentage recovery of funds committed – 55.5% – as that achieved by each of the other lending banks. While Deutsche Bank will incur losses under JPMorgan Chase's proposed distribution, those losses are the same percentage losses as those sustained by the other lending banks. Thus, JPMorgan Chase's proposed distribution achieves the purpose of the banks' original agreement to share the risks and rewards of the Genuity transaction "ratably." JPMorgan Chase has appropriately imputed to Deutsche Bank as part of its recovery the $127.5 million that Deutsche Bank was contractually obligated to fund to Genuity in the July Advance, and the decision to do so was appropriate pursuant to JPMorgan Chase's "powers and discretion," (Amended Credit Agreement § 7.01), as Agent for the banks. Accordingly, JPMorgan Chase's distribution is appropriate pursuant to the terms of the Amended Credit Agreement, and the funds held in escrow may be distributed by JPMorgan pursuant to this plan.

>2.      *Amendment No. 1 Is Not Valid Because It Was Not Properly Ratified.*

On November 12, 2002, JPMorgan Chase and six other lending banks attempted to amend the Amended Credit Agreement by signing Amendment No. 1.  This amendment purports to modify section 2.14 of the Amended Credit Agreement, which set forth that repayments by Genuity were to be distributed by JPMorgan Chase as Agent "ratably," by specifying that JPMorgan Chase was to distribute ratably payments first to the lenders that funded the July Advance until the July Advance was repaid in full before distributing any payments ratably to the lenders that contributed only to the Letter of Credit Advance, i.e., Deutsche Bank.  (Wohl Aff., Ex. 43, Amendment No. 1, § 1(d)-(e).)  That is, Amendment No. 1 provides that a bank that had defaulted on its obligations to fund the Revolver Advance – i.e., Deutsche Bank – would not be repaid any further Letter of Credit Advances the Agent might make until after the lending banks that had funded the Revolver Advance – i.e., all the lending banks except Deutsche Bank – had achieved parity with the defaulting lender by recoupment of the entire Revolver Advance.  (Id.)  As set forth above at some length, such a distribution is valid pursuant to the terms of Amended Credit Agreement without regard to the validity of Amendment No. 1.  (See supra Section III.C.1.)  Nevertheless, this Court now turns to the parties' dispute over the validity of Amendment No. 1.

As explained below, the process by which Amendment No. 1 was purportedly ratified conflicts with Section 8.01 of the Amended Credit Agreement, which governs how amendments may be made to the Amended Credit Agreement.  That Section provides as follows:

>(a)  No amendment or waiver of any provision of this Agreement . . . shall in any event be effective unless the same shall be in writing and signed by the Borrower and the Required Lenders, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose

for which given; <u>provided</u>, <u>however</u>, that: . . . (ii) no amendment, waiver or consent shall, <u>unless in writing and signed by the Required Lenders and each Lender that has or is owed obligations under this Agreement</u> . . . <u>that are modified by such amendment waiver or consent</u>, (A) increase the Commitment of such Lender or subject such Lender to any additional obligations, (B) reduce the principal of, or interest on, the Advances (other than Competitive Bid Advances) held by such Lender or any fees or amounts payable hereunder to such Lender, (C) postpone any date fixed for any payment of principal of, or interest on, the Advances (other than Competitive Bid Advances) held by such Lender or (D) <u>waive the application of Section 2.16</u>.

(Wohl Aff., Ex. 2, § 8.01(a)(ii) (emphasis added).)  The term "Required Lenders" is defined in

the Amended Credit Agreement as follows:

> 'Required Lenders' means at any time Lenders owed at least a majority in interest of the sum of (a) the aggregate unpaid principal amount of the Revolving Credit Advances outstanding at such time and (b) the aggregate unpaid principal amount of all Letter of Credit Advances outstanding at such time, or, if no such principal amount is outstanding at such time, Lenders having at least a majority in interest of the Revolving Commitments.

(<u>Id.</u>, Art. I, "Definitions and Accounting Terms.")  Here, there is no question that Amendment

No. 1 was enacted by the "Required Lenders" because it was signed by seven of the eight banks

that participated in the July Advance, and those seven banks were owed substantially more than

50% of that advance.  Thus, Amendment No. 1 received the approval of the "Required Lenders"

despite the fact that neither Deutsche Bank nor BNP Paribas signed it.

However, Section 8.01(a)(ii) requires not only the approval of the "Required Lenders,"

but also the approval of "each Lender that has or is owed obligations under this Agreement . . .

that are modified by such amendment waiver or consent."  (<u>Id.</u>, § 8.01(a)(ii).)  The parties'

dispute centers on whether Deutsche Bank is a lender that "has or is owed obligations."  If

Deutsche Bank does qualify, its signature was in fact needed to effectuate Amendment No. 1.

JPMorgan Chase contends that as of the date Amendment No. 1 was signed – November 12, 2002 – Deutsche Bank was not a Lender whose signature was required for the Amendment to be effective because Deutsche Bank was not a lender that "has or is owed obligations . . . modified by [the] amendment."  JPMorgan Chase notes that because Deutsche Bank had not participated in the July Advance, it was not – in November 2002 – owed any money by Genuity. JPMorgan Chase adds that as of the execution date of Amendment No. 1, no bank had made any Letter of Credit Advances; the only advance that was outstanding at that time was the Revolver Advance of July.  (Def.'s 56.1 ¶ 10.)  However, Deutsche Bank contends that "[a]lthough no letter of credit advance had been made as of November 12, 2002, Genuity had used $1.15 [b]illion of credit under the Credit Agreement by causing a letter of credit to issue in September 2001."  (Pl.'s 56.1 Counter Statement ¶ 10 (original says "million" [sic]).)

In response, JPMorgan Chase argues that Deutsche Bank's obligation with respect to the Letter of Credit advance was not an actual obligation, but rather a "contingent obligation." However, no such distinction is found in the text of Section 8.01(a)(ii).  Moreover, this argument ignores the fact that Genuity had caused a Letter of Credit to issue in September 2001, and Deutsche Bank was obligated to advance $172.5 million if there were a draw on the Letter of Credit.  (Amended Credit Agreement, §2.04.)  Deutsche Bank's obligation pursuant to the Letter of Credit was unconditional, and indeed in November 2002 – when Genuity's bankruptcy filing caused a default on the Genuity bonds that were backed by the letter of credit issued by JPMorgan Chase – Deutsche Bank honored its commitment when called upon to pay on the Letter of Credit.  In addition, JPMorgan Chase's reading of Section 8.01 would lead to the counterintuitive result that a majority of lenders would be able to subordinate a minority at any time before funds were drawn.  Accordingly, this Court finds that as of the enactment of

43

Amendment No. 1 on November 12, 2002, Deutsche Bank was a lender that "has or is owed obligations . . . modified by [the] amendment." Therefore, its signature on Amendment No. 1 was required.

Independently, Amendment No. 1 was not properly adopted because BNP Paribas did not sign it. By reconfiguring the payment and sharing mechanisms to authorize greater distributions to BNP Paribas, the Amendment undeniably purported to modify the obligations that BNP Paribas had and was owed. Therefore, on this basis alone, Amendment No. 1 violates the terms of Section 8.01 of the Amended Credit Agreement.

Therefore, because Amendment No. 1 was signed by neither Deutsche Bank nor BNP Paribas – even though each bank qualifies as a lender that "has or is owed obligations" that are modified by such amendment – this Court finds that Amendment No. 1 is ineffective pursuant to Section 8.01 of the Amended Credit Agreement. However, as explained above, JPMorgan Chase's proposed distribution is nevertheless valid pursuant to the Amended Credit Agreement because it achieves the purpose of the banks' original agreement to share the risks and rewards of the Genuity transaction ratably, in proportion to each bank's original commitment.

## IV. Conclusion

As set forth above, the Court finds that: Deutsche Bank breached the Amended Credit Agreement by not forwarding the July Advance, and this finding is not prohibited by the doctrine of *res judicata*; Amendment No. 1 to the amended credit agreement is null and void; nevertheless, JPMorgan Chase may distribute the escrowed funds in such a manner that repays those banks for the July Advance before distributing funds due on other advances so as to give the funding banks the same percentage recovery as that achieved by Deutsche Bank. To allow Deutsche Bank's proposed distribution would reward Deutsche Bank for failing to fund the July

Advance, and it would do so at the expense of the other eight funding banks. Accordingly,

JPMorgan Chase's motion for summary judgment is granted, Deutsche Bank's motion for

summary judgment is denied, and the Clerk of Court is directed to enter judgment.


Dated: New York, New York
       September 27, 2007

SO ORDERED:

Sidney H. Stein, U.S.D.J.